

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

NOV - 5 2015

CLERK, U.S. DISTRICT COURT
By_____
            Deputy

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTINA PATRICE JACKSON, | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:14-CV-756-A |
| | § | |
| CAROLYN COLVIN | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| DEFENDANT. | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I.   STATEMENT OF THE CASE

Plaintiff Christina Patrice Jackson (Jackson) filed this action pursuant to Sections 405(g)

and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying her claims for a period of disability and disability

insurance benefits ("DIB") under Title II and supplemental security income (SSI) under Title

XVI of the Social Security Act ("SSA").  In May 2011, Jackson applied for DIB and SSI,

alleging her disability began on June 5, 2010.  (Tr. 11, 148-58.)  After her applications were

denied initially and on reconsideration, Jackson requested a hearing before an Administrative

Law Judge ("ALJ").  (Tr. 11, 50-72.)  The ALJ held a hearing on May 9, 2013 and issued an

1

unfavorable decision on June 13, 2013.  (Tr. 8-43.)  Thereafter, on July 17, 2014 the Appeals

Council denied Jackson's request for review, leaving the ALJ's decision as the final decision of

the Commissioner.  (Tr. 1-5.)  Jackson subsequently filed this civil action seeking review of the

ALJ's decision.

## II.    STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are

governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.  In addition, numerous regulatory

provisions govern disability insurance and SSI benefits.  *See* 20 C.F.R. Pt. 404 (disability

insurance); 20 C.F.R. Pt. 416 (SSI).  Although technically governed by different statutes and

regulations, "[t]he law and regulations governing the determination of disability are the same for

both disability insurance benefits and SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994).

The SSA defines a disability as a medically determinable physical or mental impairment

lasting at least twelve months that prevents the claimant from engaging in substantial gainful

activity.  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir.

1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a

five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920 (2009).  First, the claimant must

not be presently working at any substantial gainful activity.  Substantial gainful activity is

defined as work activity involving the use of significant physical or mental abilities for pay or

profit.  *See* 20 C.F.R. §§ 404.1527, 416.972.  Second, the claimant must have an impairment or

combination of impairments that is severe.  20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v.*

*Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir.

2

2000).  Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404. Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* §§ 404.1520(e), 416.920(e).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experiences.  *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999).  At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  *Id.*  But if the Commissioner meets this burden, it is up to the claimant to then show that he cannot perform the alternate work suggested.  *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).  An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence supports the conclusion that was reached by the ALJ.  *Dollins v. Astrue*, No. 4:08-CV-00503-A, 2009 WL 1542466, at *5 (N.D. Tex. Jun. 2, 2009).  Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion.  *Boyd v.*

*Apfel*, 239 F. 3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if credible evidentiary choices or medical findings support the decision.  *Id.*  This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present.  *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

### III.   ISSUES

In her brief, Jackson presents the following issues:

1. Whether the ALJ erred as a matter of law when he failed to give appropriate weight to medical opinions expressed in the form of Global Assessment of Functioning ("GAF") ratings;[1] and

2. Whether the ALJ erred by failing to include any limitations in the residual functioning capacity (RFC) determination to account for her moderate limitations in concentration, persistence, or pace.

(Plaintiff's Brief ("Pl.'s Br.") at 2, 5-14.)

### IV.   ALJ DECISION

In his June 13, 2013 decision, the ALJ found that Jackson met the insured status requirements of the SSA through December 31, 2016 and that she had not engaged in any substantial gainful activity since June 5, 2010, the alleged onset date.  (Tr. 13.)  The ALJ further found that Jackson suffered from the following severe impairments: (1) bipolar disorder, not otherwise specified ("NOS"), and anxiety, NOS.  (*Id.*)  Next, the ALJ held that none of Jackson's

---

[1] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("DSM-IV-TR");

impairments, or combination of impairments, met or equaled the severity of any impairment in the Listing. (Tr. 14-15.)

As to Jackson's RFC, the ALJ found:

> The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:  the claimant cannot work with the general public, can only have superficial contact with coworkers and supervisors, and retains the capacity to understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings.

(Tr. 15; *see* Tr. 15-19.)  The ALJ found, based on his RFC assessment, that Jackson was unable to perform her past relevant work. (Tr. 19.)  The ALJ found, however, that Jackson was able to perform a number of jobs that existed in significant numbers in the national economy during the period at issue. (Tr. 19-20.)  Thus, the ALJ concluded that Jackson was not disabled. (Tr. 20.)

## V.   DISCUSSION

### A.  GAF Scores in Medical Opinions

In her brief, Jackson argues that the ALJ failed to properly evaluate the GAF scores in the record as medical opinions. (Pl.'s Br. at 5-6.)  Specifically, Jackson claims that this was error because the SSA considers such scores to be medical opinions. (Pl.'s Br. at 5-8.)  In addition, Jackson argues that the ALJ's specified reasons for dismissing the GAF scores have no support in the record. (Pl.'s Br. at 8-12.)

Federal regulations and Social Security Rulings explicitly require that an ALJ must evaluate "every medical opinion" of record.  20 C.F.R. §§ 404.1527, 416.927.  However, as with other opinion evidence, a medical opinion needs supporting evidence to be given much weight. *Id.*, *see also* SSR 96-6p, 1996 WL 374180, at *1 (S.S.A. July 2, 1996).   Even if well-supported,

5

the medical opinion also must not be inconsistent with the other substantial evidence in the individual case record. 20 C.F.R. §§ 404.1527, 416.927. Instead of viewing GAF scores as absolute determiners of the ability to work, ALJs should make disability determinations on a case-by-case basis, considering the entire record. *See Petree v. Astrue,* 260 F. App'x 33, 42 (10th Cir. 2007); *Holmes v. Astrue*, No. H-08-2885, 2009 WL 3190466, at *12 (Sept. 30, 2009) ("Although GAF scores are not determiners of an ability to work, the ALJ properly considered the scores along with the rest of the medical evidence in reaching his determination that [claimant] could perform her past relevant work as a hotel housekeeper."); *Stalvey v. Apfel*, No. 98-5208, 2001 WL 50747, at *2 (10th Cir. Aug. 18, 1999). It is within the ALJ's province to resolve conflicts when an assigned GAF score by a treating source conflicts with the treating source's own descriptions of the patient's mental symptoms and/or function. *Locure v. Colvin*, No. 14-1318, 2015 WL 1505903, at *9 (E.D. La. Apr. 1, 2015). Even if an ALJ mischaracterizes what a GAF score represents, any error is harmless so long as there is other substantial evidence in the record supporting the ALJ's determinations and it is clear that such errors did not alter the result. *See, e.g., Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012); *Hardy v. Astrue*, No. 07-2241-LC, 2009 WL 2777167, at *4 (W.D. La. Aug. 31, 2009).

Moreover, federal courts have declined to find such a strong correlation between an individual's GAF score and the ability or inability to work. *See* 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs, and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"). *See also, e.g., Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005);

*Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *10 (N.D. Tex. Feb. 13, 2012), *adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012).   Rather a GAF score measures an individual's "overall level of functioning" and is used for "planning treatment and measuring its impact, and in predicting outcome."   DSM-IV-TR at 32.   "Notably, both the American Psychiatric Association and the Commissioner have recently decided that GAF scores are not helpful in either medical or disability decision-making." *Locure*, 2015 WL 1505903, at *10.   In fact, "[t]he American Psychiatric Association deleted the GAF scale from its revised *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition: DSM-5* (5th ed. 2013)." *Id.* However, as noted by Jackson, the SSA published internal instructions regarding how to continue interpreting GAF scores that appear in medical records, noting that such scores should be treated as opinion evidence.   (SSA Administrative Message 13066 ("AM-13066") (effective July 22, 2013), attached as Exhibit A ("Ex. A").)[2]   Nevertheless, "[a]s with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." (AM-13066, Ex. A, at 1.)   "Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for disability analysis." (*Id.* at 4.)

As noted above, the ALJ determined that Jackson had the RFC to perform a full range of work at all exertional levels, along with the following findings: (1) cannot work with the general

---

[2] A copy can also be found at pp. 18-24 of the New York State Bar Association's seminar materials for "Moving Towards Civil Gideon," http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (visited November 5, 2015).

public; (2) can have only superficial contact with coworkers and supervisors; (3) retains the capacity to understand, remember, and carry out only simple instructions and make simple decisions; (4) can attend and concentrate for extended periods and accept instructions; and (5) can respond appropriately to changes in the work setting. (Tr. 15.)  In making this determination the ALJ relied, *inter alia*, on the following evidence: (1) treatment records at Tarrant County MHMR showing that Jackson's GAF scores ranged from 40[3] to 44[4] and that she was generally responding positively to her medication except during periods of incarceration when she was off her medications; (2) evidence that Jackson was able to work after her alleged onset date, (3) evidence that Jackson was able to drive herself to the doctor, go to her children's school once a month, go to the grocery store, cook and clean, and get her kids off to school; and (4) a Mental Residual Functional Capacity Assessment ("MRFCA") dated August 11, 2011 in which State Agency Medical Consultant Leela Reedy, M.C. ("SAMC Reedy"), opined that Jackson was "maximally able to understand, remember, carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions & respond appropriately to changes in routine work setting."[5] (Tr. 15-19; *see also* Tr. 323-25).  In addition, as to the GAF scores in the record, the ALJ stated:

> Although MHMR records reflect GAFs of 40 and 44, at times, such assessment appears to reflect the Agency's internal requirements for eligibility to

---

[3] A GAF score of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  DSM-IV-TR at 34.

[4] A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR at 34.

[5] In a Case Assessment Form dated December 15, 2011, State Agency Medical Consultant Richard Campa, Ph.D. ("SAMC Campa"), affirmed SAMC Reedy's August 11, 2011 MRFCA. (Tr. 328.)

services, rather than the claimant's condition, inasmuch as actual progress records document that initiation of medication and counseling has resulted in improvement of the claimant's symptoms. Tellingly, the GAF assessment provided by MHMR personnel fails to reflect such progress, and only a minor change in the rating. I have therefore given significant weigh to the actual MHMR treatment records, which document progressive improvement.

(Tr. 18.)

While it appears that there is no support for the ALJ's statement that the GAF scores appear to reflect the Tarrant County's MHMR internal requirements for eligibility of services rather than claimant's condition, the ALJ ultimately decided not to give more weight to the GAF scores because such scores were inconsistent with the actual treatment records from Tarrant County's MHMR. (Tr. 18.) Treatment records indicate, *inter alia*, that Jackson sought treatment at Tarrant County MHMR on August 31, 2010 due to depression and insomnia. (Tr. 276.) The records indicate that Jackson was diagnosed with bipolar disorder and that she had not been treated at Tarrant County MHMR since 2008. (Tr. 276-77.) Jackson again sought treatment at Tarrant County MHMR in April 2011, where her treating physician, James Smith, M.D. ("Dr. Smith"), diagnosed her with bipolar NOS and anxiety NOS and assessed her with a GAF score of 40. (Tr. 16, 265-73). Jackson's reported symptoms included anxiety, depression, mood swings, poor sleep, racing thoughts, auditory hallucinations, and intermittent suicidal thoughts. (Tr. 16, 265-73.) The ALJ noted that Dr. Smith observed well-groomed appearance, cooperative attitude, calm motor activity, appropriate affect, depressed and anxious mood (per patient report), normal speech, intact thought processes, intact judgment, good insight, normal attention, and no memory problem. (Tr. 16, 270.) Dr. Smith prescribed Jackson medication at this visit. (Tr. 16, 263, 266, 269.) When Jackson returned to MHMR in May 2011, she reported that, while there

9

was improvement in her concentration and she had no recent hallucinations, her depression and suspiciousness had somewhat increased and she had been noncompliant with her medication. (Tr. 16, 260-264.)  In June 2011, Jackson was "doing okay," was attending counseling, and had continued to experience hallucinations and paranoia.  (Tr. 16; *see* Tr. 385-88.)  Jackson then missed her next two appointments due to being incarcerated.  (Tr. 16, 332, 383-84, 411, 414-15.)

Jackson returned to Tarrant County MHMR in February 2012, reporting anxiety, depression, interrupted sleep, low energy, poor concentration, auditory hallucinations, and mildly elevated mood.  (Tr. 16, 411-13.)  The ALJ noted that Dr. Smith indicated that Jackson's symptoms "had been worsening since she was out of medication" as a result of being incarcerated and that Jackson had a depressed, anxious, and mildly elevated mood, changed her medication, and assessed a GAF score of 40 (Tr. 16-17, 411-13.)  Although Jackson missed her next appointment, she then had multiple follow-up appointments through August 2012, in which she attended counseling intermittently.  (Tr. 17, 392-410.)  Dr. Smith adjusted and changed Jackson's medications several times during this period, which resulted in some improvement of her symptoms and increased her GAF score to 44 in August 2012.  (Tr. 17, 382-410.)

In April 2013, Jackson returned to the MHMR following another incarceration and several missed appointments.  (Tr. 17, 390-91, 462-467.)  During this visit, Dr. Smith noted that Jackson's symptoms had again worsened as a result of her recent incarceration, similar to the last time she was off her medications due to incarceration.  (Tr. 17, 462-67.) )  In addition, Dr. Smith observed Jackson had a depressed and anxious mood, appropriate affect, well-groomed appearance, normal speech, normal thought process, intact associations, moderately impaired judgment, intact insight, intact recent and remote memory, and normal attention and

10

concentration. (Tr. 17, 463.) Dr. Smith assessed Jackson's GAF score at 40 and restarted Jackson's medications, noting that Jackson had previously reported that these medications helped improve her symptoms. (Tr. 17, 463-66.)

While Jackson argues that the ALJ failed to properly evaluate her GAF ratings, it is clear from the ALJ's decision that he did specifically consider such scores as he reported them throughout his decision. (Tr. 16-18.) The ALJ noted that during Jackson's treatment at the Tarrant County MHMR, Dr. Smith indicated that Jackson was responding positively to the prescribed medication for her symptoms, and even Jackson noted the positive improvement. (Tr. 16-18; *see also* Tr. 41.) The ALJ also recognized that the GAF scores reflected very little improvement, ranging between approximately 40 and 44, even though Dr. Smith and Jackson observed improvement with her symptoms especially when Jackson was taking her medication and undergoing counseling. (Tr. 16-18, 41, 260.) The ALJ pointed out that, although Jackson's GAF scores remained virtually the same, she was able to work, although not at substantial gainful activity, and was twice incarcerated for shoplifting, resulting in a worsening of her symptoms since Jackson was unable to obtain her medications. (Tr. 13, 16-18.) "A medical condition that can reasonably be remedied . . . by . . . medication is not disabling." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *see* 20 C.F.R. §§ 404.1530(a), 416.930(a). Moreover, even assuming *arguendo* it was error for the ALJ to mischaracterize the GAF scores, any such error is harmless as there is other evidence in the record supporting the ALJ's RFC and disability determinations, as set forth above. (Tr. 18-19.) Because the ALJ's decision is supported by substantial evidence in the record, the ALJ's decision is not subject to reversal.

11

### B. **Limitations in Concentration, Persistence, and Pace**

Next, Jackson argues that the ALJ erred by failing to include any limitations in the RFC determination to account for her moderate limitations in concentration, persistence, or pace. (Pl.'s Br. at 12.) The Court notes that federal regulations require that the ALJ follow mandatory steps when evaluating the severity of mental impairments in claimants, which is known as the "special technique." *See* 20 C.F.R. §§ 404.1520a, 416.920a. In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). For most Listings, the regulations require the ALJ to evaluate the degree of functional limitation resulting from the claimant's mental impairments pursuant to criteria identified in paragraphs A, B, and sometimes C, of the adult mental disorders contained in the Listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. §§ 404.1520a(b)(2) & (c), 416.920a(b)(2) & (c).[6] "Paragraph B" contains four broad functional areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace;[7] and 4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see* 20 C.F.R. Pt. 404, Subpt. P,

---

[6] This applies to all adult mental disorders in the Listings except Listings 12.05 and 12.09. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A.

[7] The category of concentration, persistence or pace "refers to the ability to sustain focused attention and concentration to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Part 404, Subpart P., App. 1, § 12.00C(3).

App. 1 § 12.00C.[8]   The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described.   20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment.   20 C.F.R. §§ 404.1520a(d), 416.920a(d).   If the degree of functional loss falls below a specified level in each of the four areas,[9] the ALJ must generally find the impairment is not severe at Step Two of the sequential evaluation process, which generally concludes the analysis and terminates the proceedings.   20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).   If the ALJ finds that the mental impairment is severe at Step Two, then the ALJ must determine at Step Three if it meets or equals a listed mental disorder of the Listing.   20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2).[10]   To determine if it meets or is equivalent in severity to a listed mental disorder, the ALJ must compare the medical findings about the claimant's impairment and the rating of the degree of functional

---

[8] The degree of limitation in the first three functional areas is rated on a five-point scale, which includes none, mild, moderate, marked, and extreme.   20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).   The degree of the fourth functional area is rated on a four-point scale which includes none, one or two, three, and four or more.   *Id.* These four functional areas are known as the paragraph "B" criteria.   *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.

[9] If the degree of limitation in the first three functional areas is "none" or "mild" and "none" in the fourth area, the ALJ "will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."   20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

[10] A claimant will be found to have a listed impairment "if the diagnostic description in the introductory paragraph [of the Listing] and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."   20 C.F.R. Pt. 4, Subpt. P, App. 1 § 12.00A.   "The criteria in paragraph A substantiate medically the presence of a particular mental disorder."   *Id.*   "The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity."   *Id.*

13

limitation to the criteria of the appropriate listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). If the impairment is severe but does not meet or equal a listed mental impairment, then the ALJ must conduct an RFC assessment. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3); *see Boyd*, 239 F.3d at 705.

In this case, the ALJ, in performing the paragraph B analysis under the "special technique," found that Jackson had, *inter alia*, moderate difficulties with concentration, persistence, or pace. (Tr. 14.) Then, based on all of the evidence in the record, the ALJ determined, in essence, that Jackson's moderate limitation in concentration, persistence, and pace found in the "special technique" analysis affected his RFC as a limitation that Jackson could perform work that involved carrying out only simple instructions, making simple decisions, and attending and concentrating for extended periods.[11] The paragraph B criteria limitation of having a moderate limitation in maintaining concentration, persistence, and pace that the ALJ found following the "special technique" is not an RFC assessment. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996). Instead, it is used to rate the severity of Jackson's mental impairments at Steps 2 and 3 of the sequential evaluation process. *Id.* "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorder listings in 12.00 of the Listing of Impairments." *Id.* These functions include the consideration of the claimant's abilities to: (1) understand, carry out, and remember instructions; (2) use judgment in making

---

[11] As noted above, the responsibility for determining the RFC falls to the ALJ. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995).

work-related decisions; (3) respond appropriately to supervision, co-workers, and work situations; and (4) deal with changes in a routine work setting. *Id.* at *6; *see also* 20 C.F.R. §§ 404.1545(c), 416.945(c). Moreover, "[w]hile the regulations require the ALJ to evaluate[] the limitations imposed by Plaintiff's mental impairments in certain areas and direct the ALJ to proceed to the RFC determination if Plaintiff's impairments are found severe, the regulations do not specifically require the ALJ to find that the limitations found in evaluating the mental impairment must be word-for-word incorporated into either the RFC determination or the hypothetical question posed to the VE." *Patterson v. Astrue*, No. 1:08-CV-109-C, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009).

Based on the facts in this case, the ALJ's mental RFC determination limiting Jackson to the performance of carrying out only simple instructions, making simple decisions, and attending and concentrating for extended periods is not contradictory to the ALJ's finding in the "special technique" that Jackson was moderately limited in her ability to maintain concentration, persistence, or pace. *See Bordelon v. Astrue*, 281 F. App'x 418, 422-23 (5th Cir. 2008) (finding restriction in the RFC determination to rare public interaction, low stress, and one-to-two step instructions reflect that the ALJ has reasonably incorporated the Plaintiff's moderate concentration, persistence, and pace limitations); *Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *9 (N.D. Tex. Nov. 16, 2012) ("[T]he ALJ's RFC determination limiting [the claimant] to only performing work that involved detailed instructions does not appear to be inherently contradictory with the ALJ's finding in the 'special technique' that [the claimant] was moderately limited in his ability to maintain concentration, persistence, or pace."); *De La Rosa v. Astrue*, No. EP-10-CV-351-RPM, 2012 WL 1078782, at *14-15 (W.D. Tex. Mar. 30, 2012)

15

(holding that the ALJ's finding that claimant had moderate limitation in concentration, persistence, and pace was properly accounted for in an RFC determination that claimant was, *inter alia*, able to understand, remember, and carry out detailed but not complex instructions, make decisions, and attend and concentrate for extended periods); *Patterson*, 2009 WL 3110205, at *5 (holding, in essence, that the ALJ's finding that the claimant had a moderate limitation in concentration, persistence, and pace was not inconsistent with his RFC determination that claimant could understand, remember, and carry out more than simple instructions).[12]   The ALJ properly discussed the evidence in the record in making the RFC determination, explained the reasoning for the RFC determination, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into the RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).   Because there is substantial evidence in the record that supports the ALJ's evaluation of Jackson's mental impairments as well as her mental RFC assessment, remand is not required.

---

[12] *See also Chadwell v. Astrue,* No. 4:08–CV–736–Y, 2010 WL 3659050, at *11 (N.D. Tex. May 25, 2010) ("[T]he ALJ's finding that [the claimant] was moderately limited in her ability to maintain concentration, persistence, or pace is not inherently contradictory with an RFC assessment that [the claimant] could not perform work that involves complex instructions."); *Adams v. Astrue,* No. CV 07–1248, 2008 WL 2812835, at *4 (W.D. La. June 30, 2008) ("A limitation to simple, repetitive, routine tasks adequately captures deficiencies in concentration, persistence or pace."); *Hodgson v. Astrue,* No. 4:07–CV–529–Y, 2008 WL 4277168, at *8 (N.D. Tex. Sept.16, 2008) ("[The claimant] has not demonstrated that a restriction [in the RFC determination] to simple one- and two-step tasks did not adequately accommodate her moderate difficulty maintaining concentration, persistence or pace."). *See also Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir.2001) ("Based on this record, the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive tasks adequately captures [the claimant's] deficiencies in concentration, persistence or pace."); *Anderson v. Astrue,* No. 09–0971–TC, 2011 WL 1655552, at *3 (D. Or. Mar. 25, 2011) ("Moderate, and even marked limitations in the ability to maintain attention, concentration, persistence or pace are compatible with the ability to perform unskilled jobs involving simple tasks."). *But see Eastham,* No. 3:10–CV–2001–L, 2012 WL 691893, at *6–9 (N.D. Tex. Feb.17, 2012) ("The Court finds that the Commissioner's contention that the phrase 'simple, repetitive work' encompasses difficulties with concentration, persistence, or pace is not persuasive."), *adopted in* 2012 WL 696756 (N.D. Tex. Mar.5, 2012)(Lindsay, J.); *Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir.2004) (finding that claimant's impairment in concentration, persistence, or pace was not accommodated by limitation to simple tasks in the hypothetical to the vocational expert because it did not account for deficiencies in pace); *Owen v. Astrue,* No. 3:10–CV–1439–BH, 2011 WL 588048, at *14 (N.D. Tex. Feb.9, 2011) ("As determined by several courts, a finding that Plaintiff can perform unskilled work is fatally flawed where the ALJ has found Plaintiff to have moderate limitations in concentration, persistence, or pace.")

16

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendations to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **November 19, 2015** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED November 5, 2015.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

18

# Instruction

| Identification Number | AM-13066 | Effective Date: 07/22/2013 |
|---|---|---|
| Intended Audience: | | . |
| Originating Office: | | . |

| Title: | Global Assessment of Functioning (GAF) Evidence in Disability Adjudication |
|---|---|

| Type: | AM - Admin Messages |
|---|---|
| Program: | Disability |

| Link To Reference: | See **References** at the end of this AM. |
|---|---|

Retention Date: January 22, 2014

## A. Purpose

This AM provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment of Functioning (GAF) ratings when assessing disability claims involving mental disorders. GAF ratings are frequently included in medical evidence and consultative examination reports from mental health care professionals. We consider a GAF rating as opinion evidence. As with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise.

## B. Background

The Diagnostic and Statistical Manual of Mental Disorders (DSM), published periodically by the American Psychiatric Association (APA), provides the common language and standard criteria for classification of mental disorders. The DSM, Fourth Edition, Text Revision (DSM-IV-TR) provided for a multi-axial assessment of mental disorders. Axis I

EXHIBIT A

covered clinical disorders; Axis II covered personality disorders and mental retardation; Axis III covered general medical conditions; Axis IV considered psychosocial and environmental problems; and Axis V, also known as the GAF, reported the clinician's judgment of a person's overall level of functioning.

**NOTE:** Recently the APA published a fifth edition (DSM-5) that does not include GAF rating for assessment of mental disorders. However, we will continue to receive and consider GAF in medical evidence.

## C. What is the GAF?

The GAF is a rating reporting the clinician's judgment of a person's ability to function in daily life. See DSM-IV-TR, p. 32. It reflects the clinician's subjective judgment about the person's symptom severity and psychological, social, and occupational functioning. The rating does not reflect impairment in function caused by physical or environmental limitations.

Each 10-point range within the GAF has two components: one that covers symptom severity, and a second covering functioning. If a person's symptom severity and level of functioning differ, the GAF rating reflects the lower rating. In other words, a person with a number of psychological symptoms and very few functional limitations would get a GAF score consistent with his or her reported psychological symptoms (DSM-IV-TR, p. 33).

## D. Problems with using the GAF to evaluate disability

The problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation. Researchers have pointed out numerous problems with the GAF - from the choice of rating scale, to the choice of anchor points, to the limited instructions to clinicians for rating GAFs within the 10-point intervals. Some researchers suggested that abandoning the GAF altogether in favor of a 5-point scale, might make ratings more accurate.

Other researchers had questions about the anchor points of the scale, because it is unclear whether other key words or examples would result in a better GAF. The anchor points are indicators that help the clinician establish the GAF rating. The current anchor points are generally inclusion criteria. For example, "occasionally failing to maintain personal hygiene" is a criterion that could result in a GAF rating of 20-11. Some researchers believe adding exclusion criteria to the anchors might promote better inter-rater reliability. An exclusion criterion might be "do not rate GAF lower than 20 if the individual is clean but somewhat disheveled".

As another example, some researchers have expressed concern that, as managed-care companies continue to set practice standards and quality guidelines, and the trend towards accountability for clinical outcomes continues to grow, practitioners may be

under increasing pressure to use GAF ratings and DSM diagnoses in inappropriate ways to ensure insurance coverage for treatment.

Research has also identified the propensity of some clinicians to give inflated or unrealistically low GAF ratings because the GAF rating instructions in the DSM-IV-TR are unclear. In general, inter-rater reliability ratings are low in the clinical setting because there is great variability of training and experience levels amongst clinicians. These rating problems, alone or in combination, can lead to improper assessment of impairment severity.

## 1. GAF ratings are not standardized

The GAF is neither standardized nor based on normative data. A GAF rating compares the patient with the distinctive population of patients the clinician has known. This limits direct comparability of GAF scores assigned by different evaluators or even by the same evaluator at substantially different points in time.

Although the GAF rating is numerical, the actual number assigned can be misleading because the score does not quantify differences in function between people. For example, a GAF score of 75 does not mean a person is functioning 10 units better than a person with a score of 65, nor does a GAF of 40 indicate a person is functioning half as well as a person with a score of 80.

GAF ratings assigned by different clinicians are inconsistent because of the lack of standardization. In a clinical (i.e., treatment and evaluation) setting, inter-rater reliability is generally low because of variability of training and experience levels among clinicians. This means adjudicators cannot draw reliable inferences from differences in GAF ratings assigned by different clinicians or from a single GAF score in isolation

## 2. GAF is not designed to predict outcome

Clinicians use the GAF to help plan and measure the impact of treatment (see DSM-IV-TR, p. 32). It is of limited value for assessing prognosis or treatment outcome and other measures are better indicators of outcome. For example, research suggests the highest level of functioning for a period of time is a better predictor of prognosis than the lowest level of functioning for a time period.

## 3. GAF ratings need supporting detail

The GAF scale anchors are very general and there can be a significant variation in how clinicians rate a GAF. For example, if a claimant has a GAF of 20, it could mean that he or she is not maintaining minimal personal hygiene (a clinical observation), or that the claimant has some potential to hurt himself or others (a clinical judgment). Interpreting the GAF rating requires knowing what the clinician was focusing on when assigning the overall rating. Although the DSM-IV-TR recommends assigning a rating reflecting the

lower assessment when symptom severity and level of functioning differ, evaluators rarely note whether the score reflects function, symptoms, or both.

## E. Weighing GAF ratings as opinion evidence

For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by §§ 20 CFR 404.1527(c), 416.927(c), and SSR 06-03p, while keeping the following in mind:

The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

A GAF score is never dispositive of impairment severity. **DO NOT:**

- Give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with the other evidence.

When case evidence includes a GAF from a treating source and you do not give it controlling weight, you must provide good reasons in the personalized disability explanation or decision notice.

- Equate any particular GAF score with a listing-level limitation.

You cannot use a GAF rating to determine whether a claimant's impairment meets the diagnostic criteria of mental retardation in listing 12.05, because the rating lacks specificity, may not reflect a claimant's functioning over time, and is not a standardized measure of anything, including intelligence and adaptive behavior.

- Equate a particular GAF score with a particular mental residual functional capacity assessment.

The GAF does not measure the ability to meet the mental demands of unskilled work. There have been no published studies of how, or if, GAF scores relate to meeting the demands of unskilled work. Additionally, there is no correlation between GAF scores and the B criteria in the mental disorders listings.

## Questions

Direct all program–related and technical questions to your RO support staff or PSC OA staff. RO support staff or PSC OA staff may refer questions or problems to their Central Office contacts.

**References:**
20 CFR 404.1502 General definitions and terms for subpart P
20 CFR 416.902 General definitions and terms for subpart I
20 CFR 404.1520a Evaluation of mental impairments
20 CFR 416. 920a Evaluation of mental impairments
20 CFR 404.1527 Evaluating opinion evidence
20 CFR 416.927 Evaluating opinion evidence
SSR 96-2p Titles II and XVI: Giving controlling Weight to Treating Source Medical Opinions
SSR 06-03p Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies
DI 22505.001 Medical Evidence of Record (MER) Policies
DI 22505.003 Medical and Other Evidence of an Individual's Impairment(s)
DI 22505.007 Developing Initial Evidence from Medical Sources
DI 24510.065 Section III of SSA-4734-F4-SUP Functional Capacity Assessment
DI 24515.002 Evaluating Opinion Evidence – Basic Policy
DI 24515.003 Weighing Medical Opinions from Treating Sources and Other Medical Sources
DI 24515.004 Giving Controlling Weight to Treating Source Medical Opinions (SSR 96-2p)
DI 24515.005 Evaluating Noncontrolling Treating Source Medical Opinions
DI 24515.006 Evaluating Nontreating Source Medical Opinions
DI 24515.008 Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies (SSR 06-03p)
DI 26530.015 Personalized Disability Explanation in Initial Closed Period, Unfavorable Onset Date, and DWB Allowances Where the Month Of Entitlement is Restricted to January 1991 Under P.L. 101-508
DI 26530.020 Personalized Disability Explanation in Initial Denials
DI 33015.020 Writing the Disability Hearing Officer's (DHO's) Decision
HALLEX 1-2-5-1 Evidence – General
HALLEX 1-2-5-14 Obtaining Medical Evidence from a Treating Source or Other Medical Source
*Acta Psychiatr Scand. 2007 Apr; 115(4):326-30.* Are GAF scores reliable in routine clinical use? Vatnaland T, Vatnaland J, Friis S, Opjordsmoen S.
*Psychiatr Serv. 2002 Jun 53(6) 730-7.* Global Assessment of Functioning Ratings and the Allocation and Outcomes of Mental Health Services. Moos RH, Nichol AC, Moos BS.
*Journal of Evaluation in Clinical Practice Volume 18, Issue 2, pages 502–507, April 2012* Reliability and validity of the Global Assessment of Functioning Scale in clinical outpatients with depressive disorders, Esther M. V. Grootenboer MD, Erik J. Giltay MD

PhD, Rosalind van der Lem MD, Tineke van Veen MD PhD, Nic J. A. van der Wee MD PhD, Frans G. Zitman MD PhD.
*Ann Gen Psychiatry. 2010 May 7;9:20. doi: 10.1186/1744-859X-9-20.* Global Assessment of Functioning (GAF): properties and frontier of current knowledge. Aas IH.
*Journal of Mental Health Counseling, Jul 1, 2002.* Does the Global Assessment of Functioning assess functioning? (Research), Plake, Edmund V.
The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR), American Psychiatric Association (2000).